1 | JOHNSON BOTTINI, LLP
  | FRANCIS A. BOTTINI, JR. (SBN 175783)
2 | SHAWN E. FIELDS (SBN 255267)
  | 501 West Broadway, Suite 1720
3 | San Diego, California  92101
  | Telephone:  (619) 230-0063
4 | Facsimile:   (619) 238-0622

5 | Counsel for Plaintiffs

6

7 | **UNITED STATES DISTRICT COURT**

8 | **CENTRAL DISTRICT OF CALIFORNIA**

9

10 | KEVIN FERGUSON, on behalf of himself | CASE NO. **SACV 11-00127 DOC(AJWx)**
   | and all others similarly situated,
11 |                                      | CLASS ACTION COMPLAINT FOR:
12 |           Plaintiff,
   |                                      | (1)  BREACH OF IMPLIED CONTRACT;
13 |      v.                              | (2)  BREACH OF THE IMPLIED
   |                                      |      COVENANT OF GOOD FAITH AND
14 | CORINTHIAN COLLEGES, INC.,           |      FAIR DEALING;
   | CORINTHIAN COLLEGES, INC., d/b/a     | (3)  VIOLATION OF BUS. & PROF. CODE
15 | EVEREST COLLEGE, CORINTHIAN          |      § 17200;
   | COLLEGES, INC., d/b/a EVEREST        | (4)  VIOLATION OF BUS. & PROF. CODE
16 | UNIVERSITY, CORINTHIAN COLLEGES,     |      § 17500;
   | INC., d/b/a EVEREST INSTITUTE,       | (5)  VIOLATION OF THE CONSUMER
17 | CORINTHIAN COLLEGES, INC., d/b/a     |      LEGAL REMEDIES ACT;
   | EVEREST COLLEGE OF BUSINESS,         | (6)  NEGLIGENT MISREPRESENTATION;
18 | TECHNOLOGY AND HEALTH CARE,          |      and
   | HEALD COLLEGE, LLC, and HEALD        | (7)  FRAUD.
19 | CAPITAL, LLC,
20 |                                      | **JURY TRIAL DEMANDED**
   |           Defendants.
21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

Plaintiff, by and through his undersigned counsel, alleges as follows:

## NATURE OF THE ACTION

1.    This action is brought as a class action on behalf of two classes of consisting of persons who enrolled in and/or attended classes at one of the academic institutions operated by Corinthian Colleges, Inc. ("Corinthian"):

(a)    the "Everest Class," consisting of all persons who enrolled in and/or attended classes at Everest College, Everest Institute, Everest University, Everest College of Business Technology and Health Care ("Everest Canada"), or Everest University Online (collectively, "Everest"), during the period approximately from January 24, 2005 through the present (the "Everest Class Period"); and

(b)    the "Heald Class," consisting of all persons who enrolled in and/or attended classes at Heald College, LLC ("Heald"), during the period approximately from January 24, 2009 through the present (the "Heald Class Period").

## SUMMARY OF THE ACTION

2.    Corinthian, a for-profit higher education company headquartered in Santa Ana, California, was founded in 1995. Corinthian owns and operates a number of academic institutions, including Everest and Heald. Corinthian operates 103 schools in 25 states in the U.S. and 17 colleges in the province of Ontario, Canada. In addition to these campuses, Corinthian also offers online degree programs through "Everest University Online," a division of Everest. Everest Online is headquartered in Tampa, Florida. As of September 30, 2010, Corinthian enrolled more than 113,800 students throughout the United States and Canada, over 99% of whom are enrolled at Everest or Heald.[1]

3.    On August 4, 2010, the United States Government Accountability Office ("GAO") issued a report summarizing its findings of systematic improper and deceptive practices by Corinthian and other for-profit colleges in an effort to recruit students and induce them to apply for

---

[1]  Corinthian also owns and operates the school WyoTech. However, this school is not the subject of this Class Action Complaint.

federal student loans that they do not need cannot repay.  Commenting on this GAO report in a Congressional Floor speech on September 28, 2010, Illinois Senator Richard Durbin spoke directly about Corinthian's deceptive and fraudulent practices:

> How are students doing at Everest College?  Recently, an undercover Government Accountability Office investigator went and took a look.  That investigator posed as a potential student and found that the admissions representative at Everest College misrepresented the cost and length of the program and refused to disclose the graduation rate to this so-called potential student – not surprisingly.  Do you know why?  Because only 15 percent of the student loans are being paid by the students who go to Everest; 85 percent of them are not paying their loans.  It shows they are getting into debt they cannot pay off.
>
> ***Data from the Department of Education indicates that Corinthian, overall – in all their different colleges – has a 24 percent repayment rate.  Three out of four students who go to their schools cannot pay the principal on their debt after they finish – three out of four.  It is the lowest repayment rate of any publicly traded corporation in this business.***

Congressional      Record,      September      28,      2010,      pgs.      S7587-90      (available      at http://higheredwatch.newamerica.net/node/38098) (last accessed January 20, 2011).

4.      As demonstrated below, throughout the Class Period Corinthian has engaged in a pattern of improper, fraudulent, and illegal behavior in an effort to recruit students and maximize its profits at the expense of the students' education and post-graduate employment prospects.   In particular, Corinthian has subjected Plaintiff and all members of the Class to the following uniform misleading recruitment tactics:

(a)      Hiding required disclosure information from prospective students on its websites, and requiring prospective students to enroll before gaining access to this information, in violation of Title IV of the Higher Education Act of 1965 ("Title IV") and the California Private Postsecondary Education Act of 2009;

(b)      Misrepresenting Everest's accreditations and the value of these accreditations;

(c)      Misrepresenting the ability to transfer credits from Everest or Heald to another academic institution;

(d)      Misrepresenting the true cost of attendance at its universities;

(e)      Misrepresenting Everest's and Heald's ability to qualify its graduates for certain professional certificates and licenses;

(f)     Misrepresenting the services offered by Everest's and Heald's Career Placement office;

(g)     Misrepresenting students' post-graduation employability and earnings potential;

(h)     Misrepresenting Everest's and Heald's job placement rate and career placement services;

(i)     Misrepresenting the quality of academic instruction, including the experience and qualifications of the instructors, the types of "hands on" training offered, and the sufficiency of its academic resources; and

(j)     Misrepresenting numerous facts about the federal financial aid process to students, including students' eligibility for federal grant and loan programs, students' obligation to begin repayment immediately upon enrollment, and the fact that student loans are not dischargeable in bankruptcy.

5.      These uniform material misrepresentations are made in three ways: through uniform written materials (including materials on the schools' websites) that are available and/or given to all Class members, through uniform scripted oral misrepresentations made by the schools' employees, and through material omissions of information that Corinthian had a duty to disclose and on which Class members relied when deciding to enroll at Everest or Heald.

6.      Students rely on these misrepresentations when deciding to enroll because they are misled to believe that they will receive a quality education at an affordable price, and that they will graduate with a degree that qualifies and prepares them for high paying employment in their chosen profession.  As demonstrated below, however, students pay some of the highest tuition rates in the country, are enrolled in schools with disreputable accreditations and/or are enrolled in schools at risk of losing their accreditation, receive low quality instruction from teachers, and graduate with a degree that neither qualifies nor prepares them for any job placement other than low-wage, low-skill employment.  These misrepresentations are material because, had prospective students known the truth about Corinthian's schools before enrolling, it would have affected their decision regarding whether to enroll in the first place.

-3-

7.     Corinthian continues to make these misrepresentations after students enroll, by falsely reassuring students that they are receiving a high quality education at an affordable price and that the degrees the enrolled students will receive will greatly benefit them in seeking and obtaining high-wage employment in their chosen profession.

8.     Corinthian systematically makes these misrepresentations to prospective and enrolled students for one reason only: to recruit and enroll as many students as possible, regardless of the students' stated academic and career objectives, the best interests of the students, or even the students' ability to finance their education with Corinthian.  This singular motivation was described in Senator Durbin's September 28, 2010 floor speech, during which he exposed Corinthian's unfair business practices: "They are, by and large, a marketing operation: bring the students in, sign them up, bring in the Federal dollars; bring in more students, sign them up, bring in more Federal dollars. . . . [they] are sinking young people deeply into debt in student loans that they can never pay off, promising them courses, training, and degrees that will lead to a good job and, in fact, it leads to a dead end, where they end up with a worthless piece of paper.  They don't end up with the skills they need to get a job, but they do end up in debt, with student loans to the heavens."

9.     This motivation, highlighted by Senator Durbin, reflects the fact that Corinthian is a publicly-traded company.  Unlike traditional non-profit colleges and universities, Corinthian must respond to the pressures of the market and an investor base that demands continued rates of growth.  Because Corinthian's only business is higher education and its only profits are derived from student enrollment, Corinthian must ensure that its student enrollment growth rate continues to increase.  As demonstrated below, Corinthian has done so, but only by systematically misrepresenting material facts about its schools in an attempt to induce more students to enroll.  And, after it meets its "numbers" by signing up huge number of new students through false representations and material omissions, Corinthian completely fails to deliver a quality education and fails to assert its students and graduates in finding gainful employment.

10.     Corinthian's wrongdoing results in irreparable harm to the Class because federally-subsidized student loans *are not dischargeable in bankruptcy.*  Thus, the victims of Corinthian's fraud are saddled with high debt potentially for the rest of their lives.

-4-

11.     In addition to employing deceptive tactics to induce prospective students into enrolling in its academic programs, Corinthian also takes advantage of students throughout the financial aid process for its own gain and at the expense of the students.  Throughout the course of the financial aid process, Corinthian systematically misleads students and prospective students by:

(a)     Failing to disclose that loans are disbursed directly to Everest and Heald, obligating students to repay their loans immediately upon enrollment;

(b)     Illegally delaying disbursement of students' federal loans;

(c)     Misrepresenting the maximum allowable amount of federal student grants and loans for which prospective students may qualify;

(d)     Failing to disclose that a majority of Corinthian's schools are at risk of losing their eligibility for federal financial aid because of repeated violations of Title IV;

(e)     Misrepresenting students' repayment obligations;

(f)     Failing to disclose the fact that Corinthian students default on their loans at a rate over three times the national average; and

(g)     Misrepresenting the fact that federal student loans are not dischargeable in bankruptcy.

12.     When discussing financial aid options with students, Corinthian fails to disclose the full range of financial aid options available to students, including the availability of federal Pell Grants and the maximum allowable amount of federal student loans for which students may qualify.

13.     In this regard, Corinthian has been forced to change its deceptive practices in recent years.  For a number of years Corinthian's employees systematically induced students to apply for the maximum allowable amount of federal financial aid – including federal student loans – even if the students did not need that much money to pay for their education, and even if it was clear that the students could not repay their student loans.  Corinthian's motivation stemmed from the fact that for-profit universities like Corinthian can derive as much as 90% of their total revenues from federal funding.  Known as the "90/10 Rule," Title IV allows for-profit universities to secure all but ten percent of their total funding from the federal government, including federal student grant and loan money.  Thus, Corinthian attempted to maximize its profits and derive up to 90% of its funding from

-5-

the federal government by misleading students to apply for loans they did not need and could not repay. Corinthian did not care whether these students repaid the loans, because federal student loans are fully guaranteed by the federal government, and thus by extension, the American taxpayer.

14.     However, schools that violate the "90/10 Rule" for two consecutive fiscal years by deriving *greater* than 90% of their revenues from federal funding risk losing their eligibility for all federal financial aid. As Corinthian noted in its November 3, 2010 Form 10-Q filed with the U.S. Securities and Exchange Commission ("Q3 2010 Form 10-Q"), only a temporary one-year recalculation of the "90/10 Rule" by the Department of Education saved Corinthian from *"exceed[ing] the 90% threshold at 42 of our 49 institutions."* Corinthian further stated that when the temporary recalculation expires in 2012, "compliance [with the 90/10 Rule] will be much more difficult." Thus, given Corinthian's actual or proximate violation of the rule at 86% of its campuses, Corinthian has changed its deceptive tactics by now failing to disclose to students the full range of their availability for federal financial aid. In particular, Corinthian employees fail to disclose the maximum amount of federal student loans for which students may apply, and completely fail to disclose to students the availability of free federal Pell Grants.

15.     Corinthian engages in this deception in order to induce students to rely less on federal financial aid and pay for more of their education either out of pocket or through private financing. This systematic practice harms students because many times they are induced to forego free grant money from the federal government and/or forego low-rate federal student loans on terms far more favorable than those offered in the private sector.

16.     The Department of Education specifically admonished Corinthian for these deceptive practices in an April 2010 report, finding that Corinthian "has failed to make students aware of the total amounts of financial aid for which they were entitled," including a recent increase in the annual availability of Federal Stafford Loans. Moreover, according to Confidential Witness 1 ("CW1"), a former teacher at Heald, to the extent that Corinthian discusses financial aid options at all, it encourages students to apply for federal student loans and never even mentions the option to apply for grants. One Corinthian financial aid officer confided in CW1 that this deception was intentional because "it is much easier to get more money for and from the students" from federal loans than

-6-

federal grants. This statement reflects the facts that the application and qualification process for loans is much faster than that for grants, and that Pell Grant awards are limited to the cost of tuition whereas federal loans are not. Because federal financial funds are disbursed directly to Corinthian, and not the student, Corinthian has an incentive to secure the highest amount possible, even if that means misleading students into applying for loans they are obligated to repay rather than applying for grants that they do not need to repay. The financial aid officer further admitted to CW1 that *the risk of default on a student loan does not concern Corinthian because "the loans are totally guaranteed by the government."*

17.    In addition, Corinthian also omits to disclose to class members the material fact that its Cohort Default Rates – the percentage of students who default on their students loans – is significantly higher than average. For example, Corinthian reported in its Q3 2010 Form 10-Q that the Cohort Default Rate for eight of Corinthian's campuses in 2008 (the latest year for which data is available) exceeded 25%, over three and one-half times the national average student loan default rate of 7.0%. Corinthian further projected that the number of Everest and Heald campuses exceeding a 25% default rate in 2009 would "increase significantly." *In fact, an independent analysis predicted that the Corinthian company-wide default rate may be as high as 39%.* These omissions are material because high student default rates are a leading indicator that graduates cannot repay their loans for one reason or another, whether because their education did not adequately prepare or qualify them for employment, because their degrees only allow them to secure low-wage jobs, or because their schools' tuition rates are excessive relative to the schools' value in helping graduates find meaningful and gainful employment. As demonstrated below, all these reasons play a role in Corinthian students' inability to repay their student loans.

18.    Such a high Cohort Default Rate is significant for two additional reasons. First, schools that exceed a 25% Default Rate for three consecutive years – as it appears that several of Corinthian's campuses do, or will soon – lose their eligibility for all Title IV funding, thus preventing students from accessing federal financial aid such as grants and loans to finance their education. Second, federal bankruptcy law precludes the discharging of federal student loan debt, meaning that students who were misled into applying for federally-funded loans must still repay that

-7-

debt even after filing for bankruptcy and attempting to restore their credit.  As demonstrated below, repayment of these loans is immensely difficult for current and former students who graduate with a worthless degree from Corinthian and owe tens of thousands of dollars in student loans.

19.     Corinthian also *misleadingly downplays students' federal loan repayment obligations, often telling prospective students not to worry about loan repayment.*  The motivation here is obvious: by downplaying the seriousness of one's repayment obligations, Corinthian makes applying for federal loans more attractive to the student, and because these loans are federally guaranteed, Corinthian profits regardless of whether a student defaults.  These profits are made at the expense of the student, the federal government, and by extension, the American taxpayer.

20.     Plaintiff and the other members of the Class relied on these material misrepresentations and omissions regarding federal financial aid when enrolling at Everest or Heald because their decision-making process concerning whether to enroll at Corinthian and apply for financial aid was affected by these misrepresentations and omissions.  Had they known they would be responsible for immediately repaying their loans upon enrollment, that they risked being prevented from even accessing federal financing to complete their Everest or Heald education, that Corinthian students' federal loan default rate was as high as six times the national average, and that student loans are not dischargeable in bankruptcy, their decisions would have been affected materially.

21.     These material misrepresentations irreparably harm students by inducing them to apply for federal student loans they may not need and may not be able to repay.  In fact, as Senator Durbin explained in his September 28, 2010 Congressional floor speech, Corinthian students who have been induced to take out loans for a worthless education face a lifetime of extreme economic hardship as a result of this inducement:

> "Do you know what happens when you default on a student loan in America?  It is time we tell students what they get into if they get in over their heads with a worthless education:
>
> • Your loan will be turned over to a collection agency and they may charge 25 percent [or] more to collect what you owe.
>
> • You wages will be garnished; that is, they can take it right out of your paycheck.

- Your tax refunds can be intercepted by the Federal Government if you still owe on a student loan.

- Your Social Security benefits ultimately will be withheld if you end up in debt at that point in life from a student loan.

- Your defaulted student loan will be reported to a credit bureau and will remain on your credit history for 7 years, even after it is paid. That means you may not be able to buy a car, a house or take out a credit card. It might be you cannot get a job because of your credit history. You cannot take out more student loans or receive Pell grants to go back to school.

- You are no longer eligible for HUD or VA loans.

- You could be barred from the Armed Forces and might be denied some jobs in the Federal Government.

- I might also add that most student loans are not dischargeable in bankruptcy. When the bottom falls out and you go to bankruptcy court, that is the one that will still be hanging over your head when you walk out of that court process."

Congressional Record, September 28, 2010, pgs. S7587-90 (available at http://higheredwatch.newamerica.net/node/38098) (last accessed January 20, 2011).

22. Corinthian also specifically targets members of the military and military veterans for its deceptive recruitment practices because the money Corinthian receives from veterans via federal tuition assistance programs, such as the Post-9/11 GI Bill, does not count towards the 90% cap, notwithstanding the fact that it is federal money. *As Iowa Senator Tom Harkin explained when commenting on a Senate study of for-profit universities, this backdoor channel created for for-profit universities to receive unlimited federal money "has unintentionally subjected this new generation of veterans to the worst excesses of the for-profit industry: manipulative and misleading marketing campaigns, educational programs far more expensive than comparable public or non-profit programs, and a lack of needed services."*

23. Several institutions have uncovered Corinthian's wrongdoing in the past year, including the Department of Education, the U.S. Government Accountability Office ("GAO"), and the Higher Learning Commission ("HLC"), a respected accreditation agency. For example, the Department of Education issued a report in April 2010 explaining that Corinthian "has failed to make students aware of the total amounts of financial aid for which they were entitled, failed to accurately inform students of the program costs, and delayed disbursements of Title IV funds." *As Corinthian noted in its Q3 2010 Form 10-Q, the report "characterizes certain of these findings as*

-9-

*misrepresentations by Everest . . . to its students, as a breach of fiduciary duty and as evidencing an intentional evasion of the 90/10 requirements.*"

24.     Likewise, the GAO's August 4, 2010 report found that, through uniform written and oral misrepresentations and material omissions, for-profit institutions like Corinthian induce students to enroll by misrepresenting the true cost of attendance, one's ability to qualify for and obligation to repay federal loans, the type and value of the schools' accreditations, and students' post-graduation employability and earnings potential.

25.     The HLC uncovered similarly deceptive practices, when it placed one of Everest's campuses on probation on May 1, 2009.   This probation puts Everest at risk of losing its accreditation, which would make a degree from Everest utterly worthless.  On August 19, 2010, the HLC conducted an onsite evaluation to monitor Everest's progress.  Following the evaluation, the HLC issued an Order to Show Cause stating that Everest must show marked improvement by March 21, 2011 in a number of areas to maintain its accreditation, including "realistically prepar[ing] students for a future career," "valu[ing] and support[ing] effective teaching," and devoting sufficient "learning resources [to] support student learning and effective teaching."

## JURISDICTION AND VENUE

26.     Jurisdiction is conferred pursuant to 28 U.S.C. Section 1332(d)(2)(A), because this is a class action in which minimal diversity exists and the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

27.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(a)(2) because Corinthian is headquartered and maintains its principal place of business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Corinthian has received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff Kevin Ferguson ("Ferguson") is a graduate of the Everest Institute of Miami's Medical Assistant Program.  He attended school at Everest for approximately one year from

2009-2010 after being induced to enroll by a Corinthian enrollment advisor.  He graduated at the top of his class with a 3.98 grade point average, but was unable to find employment in the medical assistant profession after graduation.  He financed his education through federal student loans, and Corinthian alleges that he owes it thousands of dollars.  Ferguson is a citizen and resident of Florida.

### Defendants

29.     Defendant Corinthian Colleges, Inc, was founded in 1995 as a California Corporation with its company headquarters at 6 Hutton Center Dr, Suite 400, Santa Ana, CA 92707. The company operates 103 colleges and two continuing education centers in 25 states, and 17 colleges in Ontario, Canada.  Corinthian held an initial public offering on February 5, 1999, and is one of the largest publicly-traded for-profit college companies in the United States.

30.     Defendant Corinthian Colleges, Inc., d/b/a Everest College is owned and operated by Corinthian. Everest College campuses are located throughout the United States and Canada. These colleges offer diploma and/or Associate degree programs in health care, business, and/or computer technology.   Everest College also offers online degree programs through "Everest University Online."

31.     Defendant Corinthian Colleges, Inc., d/b/a Everest Institute is owned and operated by Corinthian. There are approximately 27 Everest Institute campuses located in the United States. Everest Institute campuses offer diploma programs in health care, business, computer technology, electronics, and heating, ventilation and air conditioning.

32.     Defendant Corinthian Colleges, Inc., d/b/a Everest University is owned and operated by Corinthian. Everest University was formerly known as Florida Metropolitan University. Everest University has campuses located throughout the United States and Canada.  Everest University also offers online degree programs through "Everest University Online."

33.     Defendant Corinthian Colleges, Inc., d/b/a Everest College of Business Technology and Health Care is owned an operated by Corinthian.  There are approximately 17 Everest College of Business Technology and Health Care campuses in Ontario, Canada.

34.     Defendant Heald College, LLC was founded as a non-profit university in San Francisco, California in 1863.  It was later converted into a for-profit university and was known for

years as "Heald Business College."  Today Heald operates campuses in 11 cities in California, as well as in Portland, Oregon and Honolulu, Hawaii.  Heald offers associates' degrees and certificates in 34 fields.  In November 2009, Corinthian purchased Heald for $395 million and simultaneously announced plans to convert Heald into an online-only institution while retaining the Heald name.

35.     Heald Capital, LLC is the parent company of Heald College.  As of January 4, 2010, Heald Capital, LLC operates as a subsidiary of Corinthian.

### Non-Defendant Executives Officers of Corinthian

36.     Jack D. Massimino ("Massimino") is the Chief Executive Officer ("CEO") of Corinthian.  He served as CEO from November 2004 until July 2009, when he was named Executive Chairman of the Board.  He resigned from that position in July 2009, and was reappointed as CEO in November 2010.  In 2010, Massimino received $4.5 million in executive compensation.

37.     Robert D. Bosic ("Bosic") is Corinthian's Executive Vice President of Operations.

38.     William B. Buchanan ("Buchanan") has served as Corinthian's Executive Vice President for Marketing since joining the Company in July 2004.

39.     Stan A. Mortensen ("Mortensen") has served as Corinthian's General Counsel since January 2000 and currently serves as the Executive Vice President.

40.     Kenneth S. Ord ("Ord") has served as Corinthian's Executive Vice President and Chief Financial Officer since joining Corinthian in February 2005. He was named Chief Administrative Officer in December 2010.

41.     David A. Poldoian ("Poldoian") joined Corinthian in November 2004 as President and Chief Operating Officer of its Online Learning Division. In February 2008, he became Corinthian's Chief Business Development Officer, before being named Corinthian's Chief Compliance Officer in November 2010.

42.     Beth A. Wilson ("Wilson") has been with Corinthian since its inception in 1995 and has served as an Executive Vice President since July 2001.  Wilson oversees all operational support for accreditation and licensure, curriculum development and quality control, employer development, financial aid, and facilities.

43.     Roger Van Duinen ("Duinen") is the Senior Vice President of Marketing.

-12-

1

2

### CLASS ACTION ALLEGATIONS

3

44.   Plaintiff brings this action both on behalf of himself and as a class action under

4

F.R.C.P. 23(a) and 23(b) on behalf of the following Classes:

5

> All persons in the United States and Canada who, during the period from
> approximately January 24, 2005 through the present (the "Everest Class Period"),
> enrolled in and/or attended classes offered by Corinthian through any of its Everest
> academic institutions.   Excluded from the Class are defendants, their immediate
> families, subsidiaries, affiliates, successors-in-interest, representatives, trustees,
> executors, administrators, heirs, assigns or transferees, any person acting on behalf of
> defendants, all governmental entities, and co-conspirators (the "Everest Class").

6

7

8

9

> All persons in the United States who, during the period from approximately January
> 24, 2009 through the present (the "Heald Class Period"), enrolled in and/or attended
> classes offered by Heald.   Excluded from the Class are defendants, their immediate
> families, subsidiaries, affiliates, successors-in-interest, representatives, trustees,
> executors, administrators, heirs, assigns or transferees, any person acting on behalf of
> defendants, all governmental entities, and co-conspirators (the "Heald Class").

10

11

12

13

45.   Plaintiff does not know the exact number of Everest Class or Heald Class members

14

because such information is within the exclusive control of Defendants as of 9/30/2010, Corinthian

15

had 113,818 current students enrolled.  Upon information and belief, Plaintiff believes that there are

16

hundreds of thousands of Class members, geographically dispersed throughout the United States and

17

Canada, such that joinder of all Class members is impracticable.

18

46.   Plaintiff's claims are typical of the claims of the Class in that:

19

(a)   Plaintiff was enrolled in a degree program offered by Corinthian and one of its

20

academic institutions during the Everest Class Period;

21

(b)   Plaintiff was induced to enroll in this degree program by uniform affirmative

22

written   misrepresentations   published   by   Corinthian,   uniform   scripted   affirmative   oral

23

misrepresentations made by Corinthian enrollment advisors, and through Corinthian's material

24

omissions;

25

(c)   Plaintiff and all Class members were damaged by the same wrongful conduct

26

of Defendants and their co-conspirators as alleged herein; and

27

(d)   The relief sought is common to the Classes.

28

47.     Numerous questions of law or fact arise from Defendants' unfair and deceptive conduct that is common to the Class.  Among the questions of law or fact common to the Classes are:

(a)     Whether Defendants misrepresented material information about their academic institutions to Plaintiff and the Classes;

(b)     Whether Defendants misrepresented material information about federal student loan eligibility and requirements to Plaintiff and the Classes;

(c)     Whether Plaintiff and the Classes were recruited by Defendants to attend one of Corinthian's academic institutions;

(d)     Whether Plaintiff and the Classes enrolled in and/or attended online classes offered by Corinthian's academic institutions;

(e)     Whether Defendants improperly and/or illegally provided prohibited incentive payments to their enrollment advisors;

(f)     Whether Defendants improperly and/or illegally targeted veterans and active duty military personnel through their deceptive marketing practices;

(g)     Whether Defendants engaged in unfair and/or unlawful business practices during the Class Periods;

(h)     Whether Defendants engaged in unfair and/or unlawful deceptive marketing practices, including false advertising, during the Class Periods;

(i)     Whether Defendants had a duty to disclose and failed to disclose material facts to Plaintiff and the Classes;

(j)     Whether Defendants breached the implied covenant of good faith and fair dealing implied in their student enrollment contracts; and

(k)     Whether Class-wide damages, declaratory and/or injunctive relief is appropriate and, if so, the proper measure of the damages, declaratory and/or injunctive relief.

48.     These questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

49.     Plaintiff will fairly and adequately represent the interests of the Classes in that:

-14-

(a)     Plaintiff is a typical former student of a degree program offered by Defendants;

(b)     Plaintiff was induced to enroll in a degree program offered by Defendants through deceptive marketing and/or unfair business practices; and

(c)     Plaintiff has no conflicts with any other member of the Classes.

50.     Plaintiff has retained competent counsel experienced in class action litigation.

51.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

52.     Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

53.     Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Classes.

54.     Plaintiff reserves the right to expand, modify, or alter the Class definitions in response to information learned during discovery.

## FACTUAL ALLEGATIONS

### Background

55.     Corinthian, a publicly-traded for-profit higher education company headquartered in Santa Ana, California, was founded in 1995.  The Company owns and operates numerous academic institutions, including Everest Institute, Everest College, Everest University, Everest University Online, Everest Canada, WyoTech and Heald College.  Corinthian offers diploma programs and Associate, Bachelor's, and Master's degrees.

56.     As of September 30, 2010, Corinthian had 113,818 students enrolled in its institutions, 99% of whom were enrolled at Everest or Heald, and 20% of whom were enrolled exclusively in Everest's online only program.  The Company operates 103 schools in 25 states and 17 colleges in the province of Ontario, Canada.  As of September 30, 2010, Corinthian had approximately 16,800 employees in North America, including 6,300 full-time and part-time faculty members.

57.     In the past few years, Corinthian has experienced unprecedented student enrollment at its universities.   Total student enrollment at Corinthian increased 64.5% to 113,818 students on September 30, 2010, compared with 69,200 students on September 30, 2008.

58.     As demonstrated below, this explosive growth in enrollment at Corinthian's academic institutions was the result of deceptive marketing tactics designed to recruit students to attend its schools, and improper prohibited employee incentive programs designed to encourage "enrollment advisors" to recruit as many students as possible.

### *Corinthian Employs Deceptive Marketing Tactics*

59.     As demonstrated below, Corinthian employs deceptive marketing tactics designed to entice prospective students to enroll at its universities and apply for federal loans they cannot pay back.   In particular, Corinthian improperly hides information from prospective students on its websites, and misleads students either through affirmative misrepresentations or material omissions regarding the true cost of attending its universities, its schools' accreditations, the quality of academic instruction, students' post-graduation employability, and students' eligibility for federal financial aid and obligation to repay federal student loans.   These deceptive tactics are designed solely to sign up as many students as possible in order to maximize Corinthian's profits at the expense of its students, the federal government, and the American taxpayer.

### *Corinthian Improperly Hides Information From Prospective Students on Its Websites*

60.     Federal law requires educational institutions receiving Title IV funds from the federal government to "make certain information readily available to enrolled and prospective students. Institutions may satisfy their disclosure requirements by posting the information on their Internet Web sites.   Information to be provided includes: tuition, fees, and other estimated costs; the institution's refund policy; the requirements and procedures for withdrawing from the institution; a summary of the requirements for the return of Title IV grant or loan assistance funds; the institution's accreditation information; and the institution's completion or graduation rate."   Both federal and California law require academic institutions to make this information readily available to prospective students *before they enroll in any program*.

61.     The primary way in which prospective Everest or Heald students obtain information about the schools before enrolling is by accessing the schools' websites.  However, none of the websites operated by Everest or Heald contain any of the specific information required by Title IV's disclosure obligations for postsecondary institutions.  These websites do not contain any specific information about tuition costs, admissions, graduation rates, or the financial aid process.  Attempts to find specific information on any of the sites lead only to an option to complete an online enrollment form, in violation of federal and California law.

### *Corinthian Misrepresents the True Cost of Attending Everest and Heald*

62.     Corinthian uniformly misrepresents to all potential students the true cost of attending Everest or Heald.  In particular, Corinthian misrepresents Everest's and Heald's cost of attendance by quoting tuition rates for only portions of a given degree program, by failing to disclose hidden administrative fees associated with each program, and entirely omitting any cost of attendance information on its websites.

63.     In April 2010 the Department of Education exposed Corinthian's practices of misquoting tuition rates and hiding administrative fees from prospective students.  In this report, the Department of Education chastised Corinthian for systematically "fail[ing] to accurately inform students of the program costs" of its degree programs.  This failure included quoting to students the cost of attendance for a nine-month degree program when in fact the enrollment period was twelve months, failing to disclose thousands of dollars in hidden administrative fees, and misrepresenting the amount of tuition students could pay with federal student aid.

64.     Likewise, the GAO, in an August 3, 2010 report entitled "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices," explained that Everest and Heald systematically misrepresented the cost of attending its programs.  Commenting on the findings, Senator Durbin observed that the investigator posing as a potential student "found that the admissions representative at Everest College misrepresented the cost and length of the program" for which the investigator sought to enroll.

65.     In addition to misleading students through uniform oral scripted misrepresentations, Corinthian uniformly omits on its websites ***any information about the cost of attending Everest or***

-17-

*Heald*.  This omission is material because it compels students to enroll with an enrollment advisor and rely on the uniform scripted oral misrepresentations of these advisors when deciding whether to enroll.  These omissions and misrepresentations harm students who are misleadingly induced to enroll because they are induced to enroll in one of the most expensive schools in the country.

66.   For example, while each Everest campus and online program sets its own tuition rates, according to Corinthian's 2010 Annual Report undergraduate tuition rates ranged from $204-457 per credit hour and graduate tuition rates ranged from $367-548 per credit hour.  These tuition rates are among the highest in the country.  The U.S. Department of Veterans Affairs (the "VA") publishes an annual table listing the state-by-state rates for "the *highest* in-state, undergraduate, public tuition" in each state in the country.  In determining which schools are the most expensive, the VA explains that "all undergraduate program costs were taken into consideration to determine the highest in-state maximum tuition per credit hour and the maximum fees per term.  These figures may include program tuition for high cost programs such as flight courses taken as part of a degree requirement or undergraduate pharmacy, nursing and engineering degrees."  In other words, the VA's table lists the costs to attend *the very most expensive public colleges* in each state and territory in the country.  In the last updated table, published August 30, 2010 and attached hereto as **Exhibit A**, a number of states' *most expensive public colleges* charged far less per credit hour than the average cost of attendance at Everest.

### *Corinthian Misrepresents Information About Everest's Accreditations*

67.   Corinthian also misleads prospective students about Everest's accreditations in an effort to make the school seem more reputable and its degrees more marketable than they actually are.  Corinthian, through uniform written misrepresentations, uniform scripted oral misrepresentations, and material omissions, misleads students about:

    (a)   The type of accreditation each of its schools possesses;

    (b)   The value of these accreditations; and

    (c)   The schools' non-compliance with established accreditation standards.

68.   Everest says the following about its accreditation on its websites:

CLASS ACTION COMPLAINT

**How Our Accreditation Benefits You**

Accreditation is a distinction granted to any institution meeting or exceeding the stated criteria of educational quality. The purposes of accreditation include:

- Assess and enhance the educational quality of an institution
- Assure consistency in institutional operations
- Promote institutional improvement
- Provide for public accountability

*We're proud of our accreditation because it sets us apart.  It's an accreditation that shows the strength of our academic programs and instruction.* Our accreditation means that our campus:

- Is recognized as a qualified institution of higher learning with approved programs of study that meet recognized academic standards.
- Employs a professional staff.
- Has sufficient facilities and equipment.
- Is a stable and permanent fixture in the educational community.

Our campuses voluntarily undergo periodic accrediting evaluations by teams of qualified examiners including subject experts and specialists in occupational education and private school administration.

In addition, on a webpage entitled "The Everest Advantage: The Top 10 Reasons You Should Earn an Online Degree at Everest," the schools lists as their number one reason, *"Accreditation: Our accreditation sets us apart. It's an accreditation that shows the strength of our academic programs and instruction*."

69.     These statements are false and misleading because they fail to disclose that all but one of Everest's schools has a national, not regional, accreditation, and they further misrepresent the actual value of such an accreditation.  Two types of accreditation exist in the U.S.: national and regional.   While somewhat counterintuitive, regional accreditation is far more reputable and marketable than national accreditation.   Virtually all "traditional" non-profit postsecondary institutions are regionally accredited, while a majority of for-profit and "online only" postsecondary institutions are nationally accredited.   Schools with regional accreditation enjoy a much more favorable reputation within the academic community and with employers.  This enhanced reputation is evidenced by the fact that virtually no undergraduate schools will accept transfer credits from a nationally accredited school, virtually no graduate schools will recognize an undergraduate degree from a nationally accredited college as evidence of qualification for a graduate program, and a

-19-

majority of employers in professional industries refuse to recognize a degree from a nationally accredited university.

70.    Everest's failure to disclose its national accreditation status rendered the statements above false and misleading because its national accreditation does not in fact "set Everest apart" from other institutions, nor does it reflect "the strength of its academic programs" relative to other colleges and universities.    This omission was material because, had prospective students been informed about Everest's national accreditation and not been misled about this accreditation's true value, this omitted fact would have affected their decision of whether to enroll in a school with a national accreditation.    As Illinois Senator Dick Durbin stated about Corinthian's academic institutions in response to a GAO study about for-profit colleges, ***Corinthian is promising students "courses, training and degrees that will lead to a good job and, in fact, it leads to a dead end, where they end up with a worthless piece of paper."***

71.    Corinthian's statements are false and misleading for the additional reason that they fail to disclose Corinthian's long history of non-compliance with its accreditation requirements.    In particular, Everest College Phoenix – one of the Everest campuses from which the school's online program is administered – has been warned numerous times by its accrediting agency that it has not complied with the standards required of an accredited postsecondary institution.    In 2008, the HLC, the accrediting agency for Everest College Phoenix and Everest University Online, conducted an on-site evaluation of the school.    On May 1, 2009, HLC placed the school on probation because it was "out of compliance with one or more accrediting standards."    On August 19, 2010, HLC conducted an on-site "Comprehensive Evaluation Visit," after which it submitted a report that, according to Corinthian's 10-Q, "noted that while there had been some positive developments, deficiencies in the institutions compliance . . . remain unsolved."    Corinthian's Form 10-Q was itself fake and misleading because it failed to disclose all the findings of the HLC Report and all the problems with its accreditation.    In addition, Corinthian did not disclose any of the information in its Form 10-Q filing to its students.

72.    On November 4, 2010, HLC issued an Order to Show Cause, stating that Everest College Phoenix was not in compliance with numerous significant accreditation standards, and has

until March 21, 2011 to issue a report stating that the school has achieved compliance in these areas. Among other things, Everest was deemed non-compliant with the following standards:

(a)     Whether the institution realistically prepares [students] for a future shaped by multiple societal and economic trends;

(b)     Whether the institution's resource base supports its educational programs and its plans for maintaining and strengthening their quality in the future;

(c)     Whether the institution's ongoing evaluation and assessment processes provide reliable evidence of institutional effectiveness that clearly inform strategies for continuous improvement;

(d)     Whether all levels of planning align with the institution's mission, thereby enhancing its capacity to fulfill that mission;

(e)     Whether the institution values and supports effective teaching; and

(f)     Whether the institution's learning resources support student learning and effective teaching.

73.     The Order to Show Cause demonstrates that Everest offers only the façade of a genuine education and neither provides a quality education nor prepares students for post-graduate employment opportunities.   In particular, the Order to Show Cause demonstrates that Everest has subjected students to an educational experience defined by a lack of support for "effective teaching," a failure to "realistically prepare students for a future" career, and a failure to provide sufficient resources to "support student learning and effective teaching."

74.     These facts directly contradict the misleading statements on Everest's websites that Everest's accreditation "sets us apart [because it] shows the strength of our academic programs and instruction," and that Everest "has sufficient facilities and equipment."  On the contrary, Everest's probationary status and HLC's Order to Show Cause demonstrate the exact opposite – that Everest's academic programs and instruction are ineffective and that Everest does not devote sufficient resources to its facilities and equipment.   Indeed, the only thing that sets Everest apart is its probationary status and impending loss of accreditation.

75.     Corinthian had a duty to disclose Everest's probation on its accreditation webpages, and its failure to do so rendered the statements on the page false and misleading.  These affirmative written statements were also false and misleading in themselves because they falsely stated that Everest has sufficient facilities and strong academic instruction and programs when it does not. Corinthian students relied on these material misrepresentations and omissions when deciding to enroll at Everest because, had they known that Everest was at risk of losing its accreditation for not supporting "effective teaching" or "realistically prepar[ing] students for a future [career]," such information would have affected their decision of whether or not to enroll.

### *Corinthian Misrepresents the Quality and Reputation of Its Academic Programs*

76.     Corinthian also makes uniform written and scripted oral misrepresentations regarding the quality of its academic programs and the reputation these programs enjoy with potential employers.

77.     All Everest websites contain the following statement about Everest's degree programs:

**The Everest Advantage**
**Top 10 Reasons You Should Earn an Online Degree at Everest**

**1. Accreditation**
Our accreditation sets us apart. It's an accreditation that shows the strength of our academic programs and instruction.

**2. Distinguished Faculty**
Everest instructors are skilled educators with strong academic backgrounds.  All instructors have either a Master's degree or PhD along with years of professional work experience.  This unique combination of expertise provides our students with a rich learning experience.

**3. National Recognition**
Everest has campuses across the United States.  When you join an Everest online degree program, you're part of a national community of students.  Our family of Everest graduates and students are all over the country, which shows the strength of our growing community.

78.     These statements are false and misleading because they suggest that Everest's accreditation and "national recognition" place it on equal footing with other colleges and universities.  In particular, these statements not only omit the highly material fact that Everest's

accreditation is national, not regional, but also falsely suggest that degrees from Everest will be recognized as valid by potential employers or other academic institutions that recognize degrees from other accredited schools and universities.  As demonstrated above, however, this is not the case.  Virtually no academic institution will accept Everest college credits for transfer students, nor accept an Everest undergraduate degree as proof of qualification for a graduate program.  Similarly, many employers specifically do not recognize degrees from nationally accredited institutions as proof that a prospective employee qualifies for a certain position, whereas they will recognize an identical degree from a regionally accredited school as proof of qualification.

79.     Moreover, these statements suggest that students will receive a high quality education from engaged and dedicated professors.  However, as the HLC probation decision and subsequent Order to Show Cause amply demonstrate, Everest neither "values and supports effective teaching" nor ensures that its "learning resources support student learning and effective teaching."

80.     Corinthian also uniformly misrepresents on its websites the value and quality of an education at Heald.  Corinthian makes the following statements on Heald's website:

Our education philosophy is simple: **We succeed when our students succeed.**

*Unlike other career colleges, earning an associate degree at Heald is much more than just skill training. **Our education philosophy is to provide our students with the resources necessary to become well-rounded, highly motivated, qualified candidates for their career.***

***Our faculty consists of people who know what it means to be in the work force. At Heald, we hire instructors who have both academic and real-world experience.*** They teach practical, relevant skills that students will actually be able to use throughout their careers.

81.     These statements are false and misleading because Heald does not provide sufficient resources for its students, many of its teachers are not qualified, and a degree from Heald does not qualify graduates for careers in the marketplace.  According to CW1, a former teacher at Heald, the school fails to provide even the most basic classroom resources or educational tools for students in its degree programs.  CW1 explained that Heald asked him/her to teach an advanced science class for a nursing degree program "in about a tenth of the time that was needed to properly teach the

course.  When I told them that I could not teach the course in that period of time, *I was told that the classes had to be short so we could offer more of them throughout the year and charge more students more money*."  CW1 observed that "*the only concern was with collecting as much tuition from as many students as possible.*  To that end, I was told to teach only eight of the 24 chapters of the book I was given, and that it did not matter which eight I taught so long as the course ended when scheduled."

82.     In addition, the textbooks themselves were insufficient for the classroom.  CW1 explained that he was given a textbook in a science field that "was completely unrelated to my course.  It was like asking me to teach French with a Greek textbook.  I later found out that this textbook was the cheapest science textbook out there."  CW1 was forced to purchase a relevant textbook – at his own expense – in order to teach the students.

83.     The school's laboratory where Heald students were supposed to engage in "hands on" learning to provide them with "real world training" was also completely insufficient.  CW1 explained that the lab "had absolutely no equipment, and only a few tables and chairs.  *There was no science equipment at all, either in the lab or anywhere else on campus.  This was a school that offered technical degrees in a number of scientific fields, including healthcare and technology.*  I could not afford to buy the equipment myself and had to cancel the lab part of the course, which made the class about half as useful as it should have been."

84.     Perhaps most troubling was CW1's revelation that a number of teachers were entirely unqualified to teach at the college level.  CW1 explained that at his campus there were "several teachers" who did not possess academic degrees in the fields they taught, did not possess any previous academic teaching experience, and did not have even real world employment experience relevant to the courses they taught.   This fact renders the statements on Heald's website false and misleading because many members of Heald's faculty do not have the necessary academic and real world experience required to educate their students.

85.     CW1 also explained that, like Everest, credits and degrees earned at Heald were generally worthless for Heald's students.  CW1 found that most of his students decided to attend Heald after being told it was a quick, easy, and inexpensive way to earn credits taking basic general

education courses "that could all be transferred to a junior college or a four year university. But that just simply is not true. No schools will accept Heald credits for transfer, and I do not know of a single student who has tried and been successful at transferring a single Heald course credit."

86.     Corinthian's   enrollment   advisors   likewise   make   uniform   scripted   oral misrepresentations about the quality and reputation of its schools, describing Everest and Heald as great schools with amazing professors who offer individualized attention to their students. These advisors uniformly claim that Everest's and Heald's degree programs are characterized by hands on training, small work teams, and individualized instruction by experienced and qualified professors who can provide real world career placement advice. These statements are false and misleading because the quality of instruction at Everest and Heald is uniformly subpar, the instructors are far less qualified than professors from comparable universities, and any career placement advice offered is useless given the fact that most employers refuse to even recognize the validity of the degrees.

87.     Corinthian enrollment advisors continue to make false and misleading statements about the quality and value of a Corinthian education, and about students' job placement prospects, during the student's period of enrollment. In an effort to maintain a high "retention rate," advisors reassure students that the students are still receiving a quality education at an affordable price and that they should continue pursuing their degrees to completion.

88.     Corinthian's false and misleading written and oral statements detailed above are and were false and misleading for the additional reasons that they omit to disclose to students the following material facts:

(a)     That Everest and Heald charge among the highest tuition rates in the nation, higher than every public undergraduate institution in many parts of the country;

(b)     That degrees from Everest and Heald are not as marketable as similar degrees from traditional postsecondary schools; and

(c)     That degrees from Everest and Heald would only be of *de minimis* use to helping graduates seek employment in their chosen profession.

### *Corinthian Misrepresents Students' Post-Graduation Employment Prospects and Its Career Placement Services*

89.     Corinthian also makes uniform written and scripted oral misrepresentations regarding students' post-graduate employment opportunities and Everest's ability and willingness to assist its graduates find employment.

90.     All Everest's websites contain the following statements about the school's degree programs:

**Career-Focused Education**
We concentrate on providing our students with career-focused education.  Our instructors are professionals in their field, and can provide you with insights that you can't get out of a text book.

**We jumpstart your job search.**
Whenever you need help finding a job, or want some advice on improving your resume or interviewing skills, our Career Services Department is ready to assist you.

Everest alumni are part of a national network of schools, so we have access to job postings all over the country.  Plus, we have a job database to help you find job openings in your area.

91.     In addition, enrollment advisors make uniform scripted oral misrepresentations to prospective students that Everest's career placement personnel will work diligently to jump start their career after graduation and *that Everest's job placement rate is well over 90%.*

92.     These statements are false and misleading because they suggest that Everest graduates will receive substantial job placement assistance from Everest and be successful in finding high-wage employment in their chosen profession upon earning a degree.  However, the facts clearly demonstrate that Everest does little if anything to prepare students for a successful career and that an Everest degree is of only *de minimis* use in helping graduates find employment.  As described above, all but one of Everest' campuses are accredited only by national accrediting agencies.  These accreditations are virtually worthless in the marketplace, as prospective employers ascribe little value to degrees from nationally accredited schools as compared to similar degrees from regionally accredited schools.

93.    Moreover, the HLC Order to Show Cause shows how little use an education from Everest is for students when attempting to find a job.   The OSC stated that Everest fails to "realistically prepare[ students] for a future career shaped by multiple societal and economic trends."

94.    Additionally, Everest uniformly misrepresents to all prospective and current students the following information about its career placement services on its websites:

Whenever you need help finding a job, or want some advice on improving your resume or interviewing skills, our Career Services Department is ready to assist you.

**Career Planning and Career Testing**
At Everest, we give students and graduates valuable links to career-planning and career-testing Web sites. We also share access to nationwide salary ranges, job titles and descriptions, occupational outlook, statistical projections and more.

**Career Search**
At Everest, *our commitment to your success extends beyond graduation. Our Career Services experts offer job-placement assistance to every student and graduate. As you start your job hunt, we'll help you with job leads and job search Web sites*, valuable industry and company information, helpful networking tips, links to professional associations' Web sites and more.

**Resumés and Cover Letters**
To help you market yourself, your skills and your new degree, we provide personalized resumé assistance to students and alumni. You'll have access to resumé templates and guidelines, cover-letter templates, formatting ideas and more.

**Interviewing Techniques**
Do job interviews terrify you? Our tips on dress code, handshake, posture, communication and follow-up can ease your mind and increase your confidence. We'll also give you an interview checklist that will serve you well throughout your career.

**References**
It can be difficult to decide who to include on a reference list. But at Everest , we make it a little easier. We'll give you a reference form template and show you how to select the right personal and professional references.

**Salary Negotiations**
Salary negotiations are often the most intimidating part of the hiring process. At Everest, we'll show you how to evaluate base salary and benefits and negotiate a higher salary. We'll also provide links to salary surveys and geographical/relocation Web sites.

95.    Likewise, Heald misrepresents the career services advice and support it provides to its students and graduates on a webpage entitled "Career Assistance for Life":

**Career services assistance for life**

*At Heald, we not only help you find a job after you graduate, we help you find a job any time you need one, throughout your career.*

**Career services assistance when you graduate**

Heald's job placement assistance is intended to help you make the transition from college to the workplace as quickly and easily as possible. *As a Heald student, you'll work with a career services advisor who will help you look for full-time or part-time work in your field of study.* We'll give you the tools necessary to present yourself professionally, so you can start a rewarding career when you graduate.

**Career services assistance whenever you need it**

*At Heald, we're committed to providing career services assistance to our graduates, for life. From graduation to retirement, we'll help you advance your career whenever you need it.* And, since we've been around for over 145 years, you can count on us to be here when you need it most.

96.      These statements are false and misleading because Everest's and Heald's Career Placement services staff provides little if any actual assistance to students and graduates in their job search.  Corinthian's career services employees do not provide individualized support or training to students and graduates, nor do they offer guidance in the areas described above.

97.      Plaintiff Ferguson's experience provides the perfect example.  Plaintiff Ferguson was induced to enroll in one of Everest's Medical Assistant programs because he was promised that the degree would prepare and qualify him for post-graduate employment, and further because Everest's Career Placement Services personnel would diligently work with him to place him in a high-skill, high-wage earning job as a medical assistant.  In reliance on these misrepresentations, Plaintiff Ferguson enrolled at the Everest Institute in Miami, completing his degree in approximately one year.  However, despite graduating first in his class with a 3.98 grade point average, maintaining a perfect attendance record, being selected as an Ambassador Presidential Nominee, and making the Dean's and President's Lists each term, he was completely unsuccessful finding employment as a medical assistant.  He spent five months looking for work in Miami, Tampa and Lake Placid, after which he was forced to accept employment as a low-paid customer service representative, a job that paid him less than half of what he made before attending Everest.

98.     In addition, Plaintiff Ferguson received none of the help from Everest's Career Placement Services department that had been promised to him.  He was matched with a career placement representative who never contacted him nor provided him with job advice or leads, despite his repeated attempts to contact her.  When Plaintiff Ferguson went to the campus to meet with her he discovered that his resumé had been placed on the bottom of a ten-inch thick stack of resumés months before and had not moved since.

99.     Given the lack of assistance from Everest's Career Placement Services department, and the general worthlessness of his degree from Everest, Plaintiff Ferguson eventually abandoned the medical assistant field altogether and resumed work in a financial services department based on his previous accounting experience.  Plaintiff Ferguson's experience personifies Senator Durbin's warning that Corinthian promises "degrees that will lead to a good job [when], in fact, it leads to a dead end, where they end up with a worthless piece of paper."

100.     Corinthian's extremely high student loan default rates further confirm the worthlessness of an Everest or Heald degree for obtaining high-wage earning employment after graduation.  The Department of Education, aware of the systematic practice among for-profit colleges of charging above-market tuition rates and encouraging students to take out loans to pay for practically worthless degrees, proposed in July 2010 to adopt a test to determine a school's ability to graduate employable students.  As Corinthian stated in its Q3 2010 Form 10-Q, the Department of Education "proposed to adopt a definition of 'gainful employment' linked to a two-part test: measuring the relationship between the debt students incur and their incomes after program completion; and measuring the rate at which all enrollees, regardless of completion, repay their loans."  In other words, this definition measures a school's ability to prepare its students for "gainful employment" after graduation by whether it helps them to secure employment at wages high enough to repay the student loans they received to finance their education.  If a high percentage of students' debt is excessive relative to their income, or if a high percentage of students are unable to repay their loans, then it is likely that the school fails to adequately prepare its students for post-graduation job placement.

101.   Corinthian expressed concern in its Q3 2010 Form 10-Q that the Education Department may adopt this test, because if adopted the test would "affect the manner in which we conduct our business . . . compliance with the gainful employment rules could have a material adverse effect on our business, financial condition, results of operations and cash flows."   This admission comes as no surprise, given that, as described below, Corinthian students default on federal student loans at a rate at least three and a half times above the national average, clearly demonstrating their inability to find adequate wage-earning employment after graduation.   In fact, Corinthian has embarked on a multi-million dollar advertising campaign specifically aimed at defeating this proposed "gainful employment" test.   In his September 28, 2010 Congressional floor speech, Senator Durbin highlighted the fact that Corinthian spent millions of dollars in advertising in 2010 to defeat the rule because it "would [force] these schools to either have to improve the salary outcomes of their students or lower tuition costs."

### *Corinthian Misleads Students About Federal Financial Aid*

102.   Corinthian also misleads students about their federal financial aid options, particularly with respect to federally financed student loans.   Corinthian, through uniform written misrepresentations, uniform scripted oral misrepresentations, and material omissions, misleads students about:

    a)   the fact that loans are disbursed directly to Everest and Heald, obligating students to repay their loans immediately upon enrollment;

    b)   the fact that Everest illegally delays disbursement of students' federal loans;

    c)   the maximum allowable amount of students loans for which prospective students may qualify;

    d)   the fact that many of Corinthian's schools are in violation of Title IV's "90/10 Rule," putting students at risk of losing the ability to finance their education through federally-financed student loans;

    e)   their eligibility for federal Pell Grants in addition to student loans;

    f)   the fact that Corinthian students default on their loans at a rate over three times the national average; and

g)    the fact that federal student loans are not dischargeable in bankruptcy.

103.    Pursuant to uniform written scripts and instructions provided to enrollment advisors during training, Corinthian employees pressure prospective students to enroll in a degree program before completing their financial aid applications, which often include applications for federally-financed student loans.  During this process, enrollment advisors fail to disclose to prospective students that these loans are disbursed directly to the school and not the individual, thus allowing the school to demand payment immediately upon enrollment rather than allowing students to defer payment until after graduation.

104.    This omission is material because, had students known they were obligated to begin repayment immediately, this information would have affected their decision to enroll at Everest or Heald and to finance their education through federal loans.  Many of Everest's and Heald's students have lower incomes, as evidenced by their qualification for federal financial aid, and made a strategic decision to attend school full time and invest in their education rather than seeking wage-earning employment.  These students' decisions would have been affected by the undisclosed material fact that they would be responsible for immediately repaying these loans while attending school rather than working.

105.    Corinthian also misleadingly fails to disclose to prospective students during the financial aid process that Everest improperly delays disbursement of students' federal loan money. In April 2010, the U.S. Department of Education found that Everest illegally "delayed disbursement of Title IV funds" in order to generate interest income for Corinthian.  This undisclosed material fact, had it been disclosed, would have affected the students' decisions regarding applying for student loans to attend the school.

106.    In the same April 2010 report, *the Department of Education found that Everest uniformly "failed to make students aware of the total amounts of financial aid to which they were entitled,"* and in particular misled students about the maximum annual federal student loan limit for which they could apply and annual maximum federal Pell Grants for which they may be eligible. This uniform misrepresentation is made to students in order to induce them to pay for more of their education out of pocket or with private financing rather than with federal financial aid.

107.    Corinthian's motivation in making this uniform misrepresentation stems from its consistent violation of Title IV's "90/10 Rule," which prohibits for-profit colleges from deriving more than 90% of their funds from the federal government.  As Corinthian stated in its Q3 2010 Form 10-Q, Everest has been in actual or proximate violation of the "90/10 Rule" for years.  Only a temporary recalculation of the rule for fiscal year 2010 by the Higher Education Authority prevented Everest from being in gross violation of the "90/10 Rule" and putting it at risk of losing all Title IV funding:

> . . . the percentage of our revenue on a cash basis attributable to Title IV funds has increased significantly over our past two completed fiscal years.   Without the temporary relief imposed by the HEOA, approximately 89.8% of our net U.S. revenues (on a cash basis) would have been derived from federal Title IV programs in fiscal 2010, and *42 of our 49 institutions would have exceeded the 90% threshold.*
> When the first portion of 90/10 relief under the HEOA expires for our fiscal year ended June 30, 2012 (starting July 1, 2011), however, compliance will be much more difficult. . . .  We are continuing to educate policy makers about the negative consequences of the 90/10 Rule, and believe that the most effective solution to address the increasing 90/10 Rule percentage is a change in the 90/10 Rule itself. . . .  There is no assurance that ED, or Congress, will address this problem by modifying the 90/10 Rule . . . If any of our institutions, depending on its size, loses eligibility to participate in federal student financial aid programs, it could have a material adverse effect on our business.

108.    In the same Q3 2010 Form 10-Q, Corinthian explained a major reason for its schools' non-compliance:

> Effective July 1, 2008, the annual unsubsidized Stafford loans available for undergraduate students under the FFEL program increased by $2,000. This increase, coupled with recent increases in grants from the Pell program and other Title IV loan limits, has resulted in our schools experiencing an increase in the revenues they receive from Title IV programs. . . . As a result of [these] increases in student loan limits and expanded eligibility for, and increases in, the maximum amount of Pell Grants, *the percentage of our revenue on a cash basis attributable to Title IV funds has increased significantly over our past two fiscal years.*

109.    Thus, Corinthian uniformly misleads prospective students about the amount of federal aid for which they may be eligible, including failing to disclose to students recent increases in Stafford loan eligibility, solely in order to attempt to prevent Corinthian from violating the "90/10 Rule".  This misrepresentation, as confirmed by the Department of Education, comes at the expense of students who rely on Corinthian's misstatements and thereby fail to secure the maximum federal grant money for which they may be eligible.  Had they been advised about this material information,

many students would have applied for more federal financial aid or, had Corinthian not allowed them to do so, would have applied to other schools not at risk of violating the 90/10 Rule.

110.     Corinthian's uniform failure to disclose to students Everest's violations of the "90/10 Rule" is another materially misleading omission on which students rely, because schools that violate this rule for two consecutive fiscal years lose all eligibility for Title IV funds.  In other words, if Everest continues to violate the rule, its students will lose the ability even to apply for federal student grant and loan money to finance their Everest education.  This risk greatly affects students who are currently enrolled in a multi-year program with Everest, because they are vulnerable to the very real threat that their federal financial assistance will disappear and they will be faced with a choice between attempting to privately finance their education or leaving school before completing the program.  This omission is material because, had prospective students known about this very real risk before enrolling, they likely would not have enrolled in the first place.

111.     To the extent that students do apply for federal financial aid, Corinthian also misleads these students by encouraging them to apply for federal student loans rather than federal Pell Grants, which are a form of scholarship financial aid that students do not have to repay.  As CW1 explained, financial aid administrators often gave presentations in his class to discuss students' various payment and financial aid options.  However, these administrators only discussed federal student loans and never talked about federal Pell Grants.  When CW1 asked a financial aid administrator about this practice, the administrator explained that "it is much easier to get more money for and from the students when they take out loans rather than getting grants."  The administrator said that Heald often received more money when students applied for loans because Pell Grants are often limited to the cost of tuition for a school, whereas students may apply for federal loans in amounts in excess of tuition.  The administrator neither seemed concerned that grants are more beneficial to students than loans, nor that many students might not be able to repay their loans.  The administrator concluded by stating that *Heald was not concerned with the risk associated with federal student loans because these loans are fully guaranteed by the federal government.*

112.     Corinthian also misleads students about financing their Everest education with federally subsidized loans and grants by failing to disclose the fact that *Everest students default on*

*their federal loans at rates at least three and a half times higher than the national average.*  As Corinthian explained in its Q3 2010 Form 10-Q, the fiscal 2008 Cohort Default Rate (the percentage of students who default on their federal student loans) for eight of its Everest institutions exceeded 25%, while the national average for 2008 was only 7%.  Even more concerning is the fact that, as Corinthian admitted while "the draft cohort default rates for the 2009 Cohort will not be available until February 2011 . . . based on currently available information, *we believe the number of our institutions which could exceeded [the] 25% default rate threshold for the 2009 Cohort will be substantially higher than for the 2008 Cohort.*"

113. *In fact, one independent analysis predicted that Corinthian's average company-wide Cohort Default Rate could be as high as 39%, meaning that two out of every five former Corinthian students has defaulted on their student loans.*

114. This omission is material because high student default rates are a leading indicator that graduates cannot repay their loans for one reason or another – either because their education did not adequately prepare or qualify them for employment, because their degrees only allow them to secure low-wage jobs, or because their schools' tuition rates are excessive relative to the schools' value in helping graduates find meaningful and gainful employment.  As described above, all these reasons play a role in Everest's and Heald's students' high default rates.  Indeed, the Department of Education's proposed "gainful employment" test designed to measure a school's ability to prepare its graduates to succeed in the marketplace directly links student default rates to a school's inability to adequately prepare its students for high-wage post-graduate employment: "[the Department of Education] also proposed a definition of 'gainful employment' linked to a two part test: measuring the relationship between the debt students incur and the their incomes after program completion; and measuring the rate at which all enrollees, regardless of completion, repay their loans."

115. Students rely on this materially omitted fact when deciding to enroll at Everest or Heald because, had they know that Everest and Heald students default on their loans at such an extraordinary rate because of their inability to secure employment after graduation, such information would have affected their decision regarding whether to enroll in the first place.

CLASS ACTION COMPLAINT

116.    Second, this omission is material because schools whose Cohort Default Rates exceed 25% per year for three consecutive years – as appears to be the case with Everest and Heald – could lose their eligibility for all Title IV funds, meaning that their students become ineligible for federal student grants and loans.  This risk greatly affects students who are currently enrolled in a multi-year program with Everest or Heald because they are vulnerable to the very real threat that their federal financial assistance will disappear and they will be faced with the choice between attempting to privately finance their education or leave school before completing the program.  This omission is material because, had prospective students known about this very real risk before enrolling, they likely would not have enrolled in the first place.

117.    All these misleading tactics are incredibly harmful to students, who are mislead into applying for loans that they cannot pay back and which will remain obligations for the rest of their lives since federal student loans are not dischargeable through bankruptcy.  Thus, tens of thousands of Class members who have defaulted on their loans after being misled by Corinthian's deceptive tactics will continue to carry a poor credit rating – potentially for life – even if they file for bankruptcy and attempt to restore their financial health.  In fact, as Senator Durbin explained in his Congressional floor speech, Corinthian students who have been induced to take out loans for a worthless education on which they default face a lifetime of extreme economic hardship as a result of this inducement:

> "Do you know what happens when you default on a student loan in America?  It is time we tell students what they get into if they get in over their heads with a worthless education:
>
> - Your loan will be turned over to a collection agency and they may charge 25 percent [or] more to collect what you owe.
>
> - You wages will be garnished; that is, they can take it right out of your paycheck.
>
> - Your tax refunds can be intercepted by the Federal Government if you still owe on a student loan.
>
> - Your Social Security benefits ultimately will be withheld if you end up in debt at that point in life from a student loan.
>
> - Your defaulted student loan will be reported to a credit bureau and will remain on your credit history for 7 years, even after it is paid.  That means you may not be able to buy a car, a house or take out a credit card.  It might be you cannot get a

job because of your credit history.  You cannot take out more student loans or receive Pell grants to go back to school.

- You are no longer eligible for HUD or VA loans.

- You could be barred from the Armed Forces and might be denied some jobs in the Federal Government.

- I might also add that most student loans are not dischargeable in bankruptcy. When the bottom falls out and you go to bankruptcy court, that is the one that will still be hanging over your head when you walk out of that court process."

Congressional   Record,   September   28,   2010,   pgs.   S7587-90   (available   at http://higheredwatch.newamerica.net/node/38098) (last accessed January 20, 2011).

### *Corinthian Targets Veterans for Its Deceptive Tactics*

118.   In a particularly shocking attempt to maintain its Title IV standing and receive billions from the federal government in federal tuition assistance, Corinthian specifically targets military veterans and active duty military personnel for enrollment, employing many of the same deceptive marketing practices described above.  Corinthian's motivation for this is simple.  In order to maintain its Title IV standing, Corinthian must derive no less than 10% of its revenues from sources other than Title IV funds and certain other federal programs.   However, the money Corinthian and other for-profit universities receive from veterans via the Post-9/11 GI Bill does not count towards the 90% limit these schools can receive in federal funding.  Thus, Corinthian can collect unlimited money from the federal government via the Post-9/11 GI Bill and still maintain its Title IV standing for purposes of receiving federal student aid.

119.   As Iowa Senator Tom Harkin explained on December 9, 2010, this backdoor channel allowing for-profit universities to receive unlimited federal money has "unintentionally subjected this new generation of veterans to the worst excesses of the for-profit industry: manipulative and misleading marketing campaigns, educational programs far more expensive than comparable public or non-profit programs, and a lack of needed services."

120.   That same day, Bloomberg News reported that twenty for-profit colleges, including Corinthian, "reaped $521 million un U.S. taxpayer funds in 2010, seven times more than in 2006, by recruiting armed-services members and veterans through misleading marketing." Bloomberg News, "For-Profit Colleges Scam Military for $521 Million, Report Says," December 9, 2010.

121.    The Bloomberg News article explained the motivation behind Corinthian and other for-profit colleges' increased focus on a misleading marketing campaign directed at veterans:

> *Getting the money from military personnel helped the companies circumvent a cap on the aid they can receive from the Education Department, their main source of income,* according to the report from Iowa Democrat Tom Harkin, chairman of the Senate Health, Education, Labor and Pensions committee.  Congress should protect veterans and taxpayers from documented abuses by those colleges, the report's authors said.

> The Post 9/11 GI Bill, which Congress passed in 2008, raised educational benefits for almost all military veterans, and in some cases allowed them to pass money for school to spouses and children, according to the report.  The colleges made it a priority to recruit military members to exploit the surge in benefits, the authors said.

> 'New Tool'

> A 1992 law allows for-profit colleges to get as much as 90 percent of their revenue from federal financial aid.  The companies seek military students and veterans because their education benefits are counted as a non-government source, according to the Harkin report.

122.    However, as with other students misled into taking out huge loans to pay for costly and ineffective for-profit online college courses, members of the U.S. military and military veterans misled into enrolling have dropped out and defaulted on loans at a much higher rate than veterans at traditional non-profit colleges:

> Dropout Rates

> Statistics suggests that the for-profit colleges attended by military members have high dropout rates and poor educational results, according to the report.  At 4 of the 5 for-profit colleges receiving the most in Post-9/11 GI Bill funding, loan repayment rates were below 37 percent, according to the report.

> At the same 4 schools, 24 percent of the students defaulted on their loans, according to the report.  The national rate of student default on government loans was 7 percent in the academic year ended 2008, the most recent period for which data are available, according to the Education Department.

Bloomberg News, "For-Profit Colleges Scam Military for $521 Million, Report Says," December 9, 2010.

123.    In addition to subjecting veterans to the same misrepresentations and material omissions described above, Corinthian engages in a number of deceptive practices aimed directly at veterans who are considering enrolling at Everest or Heald.  For example, Everest's enrollment website includes a page entitled "Military Spouse Education," in which it describes its program for enrolling spouses of active duty military personnel.  Military dependants are eligible for tuition

-37-

assistance under the Post-9/11 GI Bill.  On this page, Everest explains that it will provide "a scholarship for active duty personnel and their dependent spouse and children [enrolled online]. Scholarship awards are 15% of tuition." However, Everest does not specify anywhere on its enrollment site the actual cost of attendance.  However, as shown above, Everest's tuition rates are among the highest in the country.  The VA, which administers the Post-9/11 GI Bill, publishes an annual table on its website containing the state-by-state maximum dollar amount of tuition and fees that the Post-9/11 GI Bill and other veteran education assistance programs will cover.  As the site explains, these maximums are set "in accordance with the VA's statutory requirement to determine the *highest* in-state, undergraduate, public tuition."  In other words, the VA's table lists the costs to attend *the very most expensive public colleges* in each state of the country.  In the last updated table, published August 30, 2010, a number of states' most expensive public colleges charged far less than Everest's per credit hour tuition rates.

124.    This fact has particularly important consequences for veterans choosing between various higher education options.  As noted above, the Post-9/11 GI Bill will only pay for tuition costs up to the maximum charge per credit hour of the most expensive public college in a given state.  While this is an incredibly generous benefit, unfortunately for veterans in many states it simply is not generous enough to cover the extremely high costs of attending Everest or Heald.

125.    The result of this deception is that veterans who otherwise should never have been forced to take out loans to finance their postsecondary education are encouraged by Corinthian to apply for loans, and often end up with far more debt than was necessary or than they can pay back. As the Bloomberg News article above observed, student loan default rates among veterans at for-profit institutions are much higher than for veterans at comparable public or non-profit schools.  Had these veterans not been misled into attending such an expensive and low-quality institution, many of them likely would have never attended Everest or Heald, never taken out a loan, and would have graduated from a more reputable college with no debt.

126.    The statements detailed above that were and are directed at military veterans and active duty military personnel are false and misleading because Corinthian failed and fails to disclose the following material facts to Plaintiff and the Classes:

(a)     That students have an absolute obligation to repay student loans and risk being saddled with their loan debt for life because federal student loans are not dischargeable through bankruptcy;

(b)     That Everest and Heald charge some of the highest tuition rates in the country;

(c)     That degrees from Everest and Heald are not as marketable as similar degrees from traditional postsecondary schools, making it hard for their graduates to repay their student loans after graduation;

(d)     That degrees from Everest and Heald are only of *de minimis* use to graduates seeking employment in their chosen profession, making it more difficult for graduates to repay their student loans after graduation; and

(e)     That members of the U.S. Military and military veterans drop out and default on student loans at a much higher rate at for-profit colleges like Everest than at traditional non-profit colleges.

### Corinthian's Prohibited Incentive System Encourages "Enrollment Advisors" to Employ Deceptive and Harassing Marketing Tactics

127.    Schools that participate in Title IV education programs, such as Corinthian, are prohibited from providing incentive payments to employees for securing student enrollment. However, Corinthian provides both incentive payments to its enrollment advisors for recruiting and securing student enrollment, and fosters a competitive environment whereby an enrollment advisor's success or failure is determined not by the accuracy or quality of advice given to prospective students, but by the number of prospective students the advisor actually enrolls.  The result is that enrollment advisors give false and misleading information to get students to enroll, and also agree to enroll prospective students even when it is obvious that the prospective student did not qualify or would not benefit from the program.

### The GAO Exposes Corinthian's Misfeasance

128.    In 2009, the federal government instructed the U.S. Government Accountability Office ("GAO") to investigate the practices of for-profit colleges and universities like Corinthian for the following reasons:

(a)    **Exploding Enrollment**: Enrollment in these colleges has grown far faster in the last decade than at traditional higher-education institutions.  Enrollment in for-profit colleges has grown from about 365,000 students in 2004 to approximately 1.8 million in 2009;

(b)    **Growth of Publicly-Traded For-Profit Colleges**: The fourteen largest for-profit corporations (which includes Corinthian), worth $26 billion as of July 2010, enrolled some 1.4 million students in their wholly owned subsidiary for-profit colleges;

(c)    **Disproportionate Federal Financial Assistance**: In 2009, students at for-profit colleges received more than $4 billion in Pell Grants (a type of federal government student tuition grant) and more than $20 billion in federal loans provided by the Department of Education.  This represents roughly 25% of all Federal Pell Grants and federal loans given to college students throughout the country, despite the fact that for-profit college students represent only approximately 9% of all college students; and

(d)    **Disproportionate Student Loan Default Rates**: Students at for-profit colleges also represent a vastly disproportionate percentage of those students who default on their federally administered student loans.  **When a student defaults on a federal loan, the government and the American taxpayer must pick up the tab.**  In 2009, despite representing only 9% of college students throughout the country, students at for-profit colleges and universities were responsible for 44% of all student loan defaults in the country.

129.    Corinthian confirmed in its 10-Q that Everest was one of the for-profit institutions investigated by the GAO: "we believe that two of our campuses, one of which was Everest College Phoenix, were among those visited by the GAO.  At the [Congressional] Committee hearing on August 4, 2010, the GAO provided testimony that characterized the interactions between our campus personnel and the GAO investigators as 'deceptive or otherwise questionable.'"

130.    On August 3, 2010, the GAO issued a report concluding that for-profit educational institutions, like Corinthian, had engaged in a pattern of behavior whereby they systematically recruited students through deceptive marketing, harassing recruitment tactics, and prohibited employee incentive programs in an attempt to increase student enrollment and drive up company profits.  The GAO report confirmed the systematic nature of the deceptive and unlawful practices

-40-

described above that are employed by for-profit institutions like Corinthian, concluding that they misrepresented to prospective students, among other things, the true cost of attending the school, their ability to receive and obligation to repay federal tuition assistance, and their post-graduation employability and salary potential.  The report further confirmed that many of these schools also paid bonuses to enrollment advisors based directly on the numbers of students the advisors enrolled or retained with the school, in direct violation of federal law.  The GAO also found that every for-profit institution investigated made deceptive and misleading statements regarding federal financial aid in a direct effort to secure a students' application for the maximum allowable loan amount under federal guidelines.

131.   The GAO report further concluded that many of these for-profit institutions specifically targeted veterans and active military personnel by offering misleading military benefits plans.  For example, many schools recruited potential students who received tuition assistance under the Post-9/11 GI Bill by claiming to offer military discounts on tuition, when in reality they were charging tuition rates far in excess of what the Post-9/11 GI Bill and other veterans' tuition assistance programs cover.

## EQUITABLE TOLLING ALLEGATIONS

132.   At all relevant times when Defendants induced Plaintiff and members of the Class to enroll at Everest or Heald through misleading misrepresentations and under false pretenses, Defendants fraudulently concealed relevant facts that would have allowed Plaintiff and the Class to discover the false and misleading misrepresentations complained of herein.  In addition, Defendants continued to make reassuring misrepresentations to Plaintiff and the Class following their enrollment in a fraudulent effort to retain Plaintiff and the Class in their online degree programs under false pretenses for as long as possible.  As a result of this fraudulent concealment, equitable tolling of the statute of limitations applies as to the claims asserted by Plaintiff and the Class.  Any applicable statute of limitations that might otherwise bar certain of the claims at issue should be tolled because Defendants actively misled Plaintiff and the Class with respect to the true cost of attending Corinthian's universities, the quality of the academic instruction, students' post-graduation job prospects, employability and earnings potential, Everest's and Heald's career placement services,

-41-

federal student loan repayment options and obligations, and Corinthian's students' federal loan repayment rate.

133.   Plaintiff exercised due diligence to discover Defendants' wrongdoing.   However, such wrongdoing was not discoverable prior to the date of the filing of this action since Defendants fraudulently concealed their wrongdoing.   Defendants have never publicly disclosed their wrongdoing in making the uniform, class-wide written and oral misrepresentations and material omissions alleged herein.   Plaintiff exercised due diligence by promptly filing his Complaint after discovering the facts giving rise to these claims.

## FIRST CLAIM FOR RELIEF
### *Breach of Implied Contract*

134.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

135.   Plaintiff, members of the Class and Defendants entered into implied contracts based upon numerous promises of performance made by Defendants.   Specifically, Defendants misrepresented to Plaintiff and the Class that they would deliver the following benefits:

    (a)   Provide a high-quality education at an affordable tuition rate;

    (b)   Prepare students for successful job placement in their profession of choice;

    (c)   Provide students the opportunity to earn top salaries in their chosen profession; and

    (d)   Assist students with job search and interview skills and career placement during and after enrollment.

136.   In reliance on these misrepresentations, and as consideration for performance of these promises by Defendants, Plaintiff and the Class promised to enroll as students Everest or Heald, and pay the tuition rates quoted to them by Defendants for their degree programs.

137.   Plaintiff and members of the Class complied with all their obligations under the implied contracts.

138.   Plaintiff and members of the Class have been deprived of the benefits of their agreements with Defendants.

139.   Defendants breached their implied contracts with Plaintiff and members of the Class by failing to deliver the benefits promised.

140.   As a result of Defendants' breach of implied contract, Plaintiff and members of the Class have suffered damages.

141.   Defendants are accordingly liable to Plaintiff and members of the Class for breach of implied contract.

## SECOND CLAIM FOR RELIEF
### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

142.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

143.   There is a covenant of good faith and fair dealing implied in every contract.   This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.

144.   Defendants breached the implied covenant of good faith and fair dealing in their contracts with Plaintiff and the Class by taking steps to interfere with the ability of the Class to receive the benefits of the education promised by Defendants.

145.   As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and members of the Class have been damaged.

146.   Defendants are accordingly liable to Plaintiff and members of the Class for breach of the implied covenant of good faith and fair dealing.   Plaintiff seek actual damages and an injunction ordering Defendants to comply with the obligations of the contracts entered into by the Class and Defendants, and to refrain from taking any action to interfere with the Class's right to receive contractual benefits.

## THIRD CLAIM FOR RELIEF
### *Violation of Bus. & Prof. Code § 17200 et seq.*

147.   Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

148.   The Unfair Trade Practices Act defines unfair competition to include any "unfair" or "unlawful" business act or practice.  Bus. & Prof. Code § 17200.  Unfair competition also includes "unfair, deceptive, untrue or misleading advertising."  *Id.*  The Act also provides for injunctive relief and restitution for violations.  *Id.*  § 17203.

149.   This cause of action is brought on behalf of Plaintiff, members of the Class, and members of the general public pursuant to California Business & Professions Code § 17200 *et seq.* Under Bus. & Prof. Code § 17200 *et seq.*, Plaintiff is entitled to enjoin Defendants' wrongful practices and to obtain restitution for the monies paid to Defendants by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

150.   As a direct and proximate result of the acts and practices alleged above, members of the Class and the general public who enrolled in and/or attended classes at Everest or Heald have been injured.  This Court is empowered to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully took money.

151.   Defendants violated Bus. & Prof. Code § 17200 *et seq.* because they breached their contracts with Plaintiff and the Class, breached the implied covenant of good faith and fair dealing, violated the Consumer Legal Remedies Act, violated Bus. & Prof. Code § 17500 *et seq.*, negligently misrepresented facts to Plaintiff and the Class, committed fraud, and violated Title IV.

152.   Defendants further violated Bus. & Prof. Code § 17200 *et seq.* because they violated numerous provisions of the California Private Postsecondary Education Act of 2009.  Under this Act, private postsecondary institutions may not:

(a)   Promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation (§ 94897(b));

(b)   Advertise concerning job availability, degree of skill, or length of time required to learn a trade or skill unless the information is accurate and not misleading (§ 94897(c));

(c)   Pay any consideration to a person to induce that person to sign an enrollment agreement for an educational program (§ 94897(h));

(d)   Compensate an employee involved in recruitment, enrollment, admissions, student attendance, or sales of educational materials to students on the basis of a commission,

-44-

commission draw, bonus, quota, or other similar method related to the recruitment, enrollment, admissions, student attendance, or sales of educational materials to students (§ 94897(n)); or

(e)     Require a prospective student to provide personal contact information in order to obtain, from the institution's Internet Web site, educational program information that is required to be contained in the school catalog or any information required pursuant to the consumer information requirements of Title IV of the federal Higher Education Act of 1965, and any amendments thereto (§ 94897(o)).

153.     Defendants violated each of these provisions by virtue of their deceptive, misleading and unfair business practices complained of herein.

154.     Defendants' unlawful and unfair business acts and practices, as described above, present a continuing threat to members of the Class and of the general public, in that Defendants are continuing, and will continue, unless enjoined, to commit violations of Bus. & Prof. Code § 17200. This Court is empowered to, and should, grant restitution to the Class as well as preliminary and permanent injunctive relief against Defendants' acts and practices.

### FOURTH CLAIM FOR RELIEF
#### *Violation of Bus. & Prof. Code § 17500 et seq.*

155.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

156.     The False Advertising Act makes it is unlawful to "make or disseminate or cause to be made or disseminated before the public [a statement] which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading" with the intent to "induce the public to enter into any obligation relating thereto." Such statements include statements made through "any advertising device," including "over the Internet." Bus. & Prof. Code § 17500.

157.     This cause of action is brought on behalf of Plaintiff and the Class under Bus. & Prof. Code § 17500 *et seq.* Under Bus. & Prof. Code § 17500 *et seq.*, Plaintiff is entitled to enjoin Defendants' wrongful practices and to obtain restitution for the monies paid to Defendants by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

158.     Defendants violated Bus. & Prof. Code § 17500 *et seq.* by making or disseminating or causing to be made or disseminated false and misleading statements on their websites about the true cost of attending Corinthian's schools, the schools' accreditations, the quality of the academic instruction, students' post-graduation job prospects, employability and earnings potential, and the type of career placement services offered by Everest and Heald employees.   These false and misleading statements were made with the intent to induce the general public, including Plaintiff and the Classes, to enroll in Defendants' online degree and certificate programs.

159.     Plaintiff and the Classes did in fact rely on these false and misleading statements when deciding to enroll in Defendants' online certificate and degree programs.   As a direct and proximate result of the acts and practices alleged above, members of the Classes and the general public who enrolled in and/or attended classes at Everest or Heald have been injured.   This Court is empowered to, and should, order restitution to all persons from whom Defendants unfairly and/or unlawfully took money.

160.     Defendants' unlawful and false and misleading advertising, as described above, presents a continuing threat to members of the Classes and the general public, in that Defendants are continuing, and will continue, unless enjoined, to commit violations of Bus. & Prof. Code § 17500 *et seq.*   This Court is empowered to, and should, grant preliminary and permanent injunctive relief against such acts and practices.

### FIFTH CLAIM FOR RELIEF
#### *Violation of the Consumer Legal Remedies Act*

161.     Plaintiff realleges and incorporates by reference each and every allegation above as if fully set forth herein.

162.     This cause of action is brought on behalf of Plaintiff and the Classes under California Civil Code § 1750 *et seq.*   Under California Civil Code § 1750 *et seq.*, Plaintiff is entitled to enjoin Defendants' wrongful practices by reason of Defendants' unlawful, unfair, and/or deceptive acts and practices.

163.    The Consumer Legal Remedies Act prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of goods and services.

164.    Defendants violated the Consumer Legal Remedies Act by misrepresenting to Plaintiff and members of the Class: the true cost of attendance at Everest and Heald, the quality of academic instruction at these schools, students' post-graduation employability, the type of career placement services offered to students, and prospective students' federal financial assistance options.

165.    Defendants' unlawful and unfair business acts and practices, and unfair, deceptive, untrue, and misleading advertising, as described above, present a continuing threat to Plaintiff, members of the Classes and members of the general public, in that Defendants continue to mislead prospective students into enrolling in programs offered by Corinthian in violation of the Consumer Legal Remedies Act.  This Court is empowered to, and should, grant preliminary and permanent injunctive relief against such acts and practices.

166.    By reason of the above-described violations of the Consumer Legal Remedies Act, Plaintiff and each member of the Classes has suffered damages.  Plaintiff seeks an injunction barring Defendants' illegal and unfair business practices.

## SIXTH CLAIM FOR RELIEF
### *Negligent Misrepresentation*

167.    Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

168.    Defendants made uniform and identical material written representations regarding the cost of attending Everest and Heald, the value of the schools' accreditations and degree programs offered at these schools, the quality of the schools as compared to other institutions, and students' post-graduation employability.  Defendants also omitted to disclose the material facts alleged herein.  When Defendants made these representations and omissions, they had no reasonable grounds for believing them to be true.  Nonetheless, Defendants made these material representations and omissions in order to induce Plaintiff and the Class to act in reliance on these representations and to enroll at Everest or Heald, or with the expectation that they would so act.  Plaintiff and each member

of the Class relied on these negligent representations before enrolling at one of these schools and relied on these misrepresentations in deciding to so enroll.

169. At the time Defendants made the misrepresentations discussed above, Plaintiff and the members of the Classes were ignorant of the true facts. Had they known the true facts, Plaintiff and the members of the Class would not have enrolled at Everest.

170. As a proximate result of Defendants' negligent conduct, Plaintiff and members of the Classes have been damaged in an amount in excess of this Court's jurisdiction, the exact amount to be proven at trial.

<strong><u>SEVENTH CLAIM FOR RELIEF</u></strong><br><strong><em>Fraud</em></strong>

171. Plaintiff repeats and realleges the allegations contained above as if fully stated herein.

172. As part of their fraudulent recruiting program, Defendants engaged in a pattern and practice of knowingly and intentionally making numerous false representations of material fact, and material omissions, with intent to deceive and/or induce reliance by Plaintiff and the Classes. Plaintiff and the Classes did in fact justifiably rely on these misrepresentations and omissions, resulting in substantial damage to Plaintiff and the Classes.

173. Defendants induced Plaintiff and the Classes to enroll and/or attend classes at Everest by making one or more, or in many cases all, of the following false and fraudulent misrepresentations of fact to Plaintiff and the Classes:

(a) Everest's schools have valuable accreditations: "We're proud of our accreditation because it sets us apart. It's an accreditation that shows the strength of our academic programs and instruction."

    i. This statement was false and misleading at the time it was made.

    ii. As demonstrated above, throughout the Class Period Everest's schools did not have valuable accreditations that "set them apart" from other institutions. All but one of Everest's schools had only a national accreditation, which is far less respected and marketable than the regional accreditation the vast majority of colleges and universities in

-48-

the U.S. possess.  This national accreditation virtually ensures that Everest students will be unable to transfer credits from Everest to another university, enroll in a graduate program at another academic institution, or finding meaningful wage-earning employment in the profession of their choosing.

iii.   This statement was also false and misleading when made because Everest was and has been on probation from its accrediting agency since May 2009 for failure to meet basic standards of accreditation, including providing sufficient resources for Everest and offering support for "effective teaching."

iv.   Defendants knew this statement to be false and misleading at the time it was made.  While fraudulently misrepresenting on its website and through uniform scripted oral representations that students at Everest's accreditation demonstrated the strength of its academic programs, Defendants fraudulently concealed the fact that Everest neither "realistically prepares [students] for a future shaped by multiple societal and economic trends," "values and supports effective teaching," nor offers "learning resources [that] support student learning and effective teaching."

(b)   At Everest, "we jumpstart your job search.  Whenever you need help finding a job, or want some advice on improving your resume or interviewing skills, our Career Services Department is ready to assist you."

i.   This statement was false and misleading at the time it was made.

ii.   As demonstrated above, throughout the Class Period, Everest's Career Placement Services department did not provide students with any of the job training or career placement services that it promised to provide.  Everest did not and does not give students and graduates

legitimate job placement leads, advice on resume-building or interview techniques, or any other career placement advice.

    iii.    Defendants knew this statement was false and misleading at the time it was made.

174.    The representations set forth above were part of a common scheme or plan and a pattern or practice conceived and executed by Defendants, over the course of the entire statutory period and prior, through their individual employees, including without limitation, enrollment advisors and financial aid officers.

175.    Defendants knew that these misrepresentations were false when made, and made them with the intent to induce Plaintiffs and the Classes to rely upon them.

176.    In addition, Defendants occupied a fiduciary position as educators, and owed a heightened duty to Plaintiffs and the Classes to act in good faith and with full candor and honesty. Defendants breached these fiduciary duties and duties of good faith, candor, and disclosure by omitting to disclose material facts alleged above to Plaintiffs and the Classes, including:

    (a)    That Everest and Heald charge some of the highest tuition rates in the country;

    (b)    That federal student loans are not dischargeable through bankruptcy;

    (c)    That degrees from Everest and Heald are not nearly as marketable as similar degrees from traditional postsecondary schools;

    (d)    That degrees from Everest and Heald are only of *de minimis* use in helping graduates seek employment in their chosen profession;

    (e)    That Everest has been and continues to be on accreditation probation for failure to meet basic accrediting standards;

    (f)    That a majority of Corinthian's campuses risk losing all eligibility for Title IV federal funding because of repeated violations; and

    (g)    That Corinthian students default on their student loans at a rate as high as six times the national average.

177.    Plaintiff and the Classes were ignorant of the true facts and relied upon Defendants' misrepresentations in deciding to enroll at Everest and/or Heald.

-50-

178.    Accordingly, Plaintiff and each member of the Class have been damaged.

179.    Defendants' herein-alleged wrongful acts and omissions, and each of them, were knowingly, willfully, intentionally, maliciously, oppressively, and fraudulently undertaken with the express purpose and intention of defrauding Plaintiff and the Classes, and each of them, all to the substantial financial benefit of Defendants.   As a result, Plaintiff and the Classes are entitled to punitive damages.

180.    As a proximate result of Defendants' negligent conduct, Plaintiff and members of the Classes have been damaged in an amount in excess of this Court's jurisdiction, the exact amount to be proven at trial.

181.    This Court is empowered to, and should, impose punitive damages for Defendants' fraudulent conduct in an amount sufficient to set an example of Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    A declaration that this action is a proper class action under Federal Rule of Civil Procedure 23 on behalf of the Classes as defined herein, and an order directing that reasonable notice of this action be given to each member of the Classes;

B.    A declaration that Defendants' conduct alleged herein constitutes a breach of contract, breach of the implied covenant of good faith and fair dealing, a violation of Bus. & Prof. Code §§ 17200 and 17500, a violation of Title IV, a violation of the California Private Postsecondary Education Act of 2009, a violation of the Consumer Legal Remedies Act, negligent misrepresentation, and fraud;

C.    An injunction enjoining, preliminarily and permanently, Defendants from continuing the unlawful conduct alleged herein;

D.    For restitution to Plaintiff and each member of the Classes, as his or her interest may appear, of all sums unlawfully collected by Defendants from the Plaintiff and other members of the Classes during the Class Period;

E.    For disgorgement of all profits obtained by Defendants as a result of their unfair business practices;

1   F.      For an award of punitive damages sufficient to make an example of Defendants;

2   G.      An award for Plaintiff and the Classes for the costs of this suit (including expert fees),

3   and reasonable attorneys' fees, as provided by law; and

4   H.      An award for such other and further relief as the nature of this case may require or as

5   this Court deems just, equitable, and proper.

6                                   **JURY DEMAND**

7       Plaintiff demands a jury trial of all triable issues.

8

9   DATED:  January 24, 2011                    JOHNSON BOTTINI, LLP
                                                FRANCIS A. BOTTINI, JR.
10                                              SHAWN A. FIELDS

11

12                                              _____
                                                FRANCIS A. BOTTINI, JR.

13                                              501 West Broadway, Suite 1720
                                                San Diego, CA 92101
14                                              Telephone: (619) 230-0063
                                                Facsimile: (619) 238-0622

15                                              Counsel for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

-52-

CLASS ACTION COMPLAINT

EXHIBIT A

| State | Maximum Charge per Credit Hour | Maximum Total Fees per Term |
|---|---|---|
| Alabama | $329.17 | $20,787.00 |
| Alaska | $170.00 | $19,455.00 |
| Arizona | $725.00 | $15,000.00 |
| Arkansas | $210.15 | $1,774.78 |
| California | $391.75 | $2,264.75 |
| Colorado | $529.50 | $45,774.25 |
| Connecticut | $543.00 | $2,660.50 |
| Delaware | $425.33 | $584.00 |
| District of Columbia | $265.83 | $310.00 |
| Florida | $295.00 | $43,660.00 |
| Guam | $190.00 | $249.00 |
| Georgia | $505.00 | $15,440.00 |
| Hawaii | $316.00 | $1,325.70 |
| Idaho | $273.00 | $2,428.24 |
| Illinois | $629.75 | $16,367.00 |
| Indiana | $338.50 | $13,063.00 |
| Iowa | $343.66 | $17,222.00 |
| Kansas | $420.05 | $50,752.96 |
| Kentucky | $456.30 | $11,235.00 |
| Louisiana | $473.00 | $2,884.70 |
| Maine | $345.00 | $5,500.00 |
| Maryland | $471.86 | $16,308.00 |
| Massachusetts | $340.00 | $20,793.50 |
| Michigan | $1,001.00 | $19,374.50 |
| Minnesota | $450.00 | $37,808.00 |
| Mississippi | $584.75 | $805.00 |
| Missouri | $373.00 | $11,898.00 |
| Montana | $205.40 | $13,646.00 |
| Nebraska | $251.00 | $1,589.55 |
| Nevada | $156.75 | $4,072.46 |
| New Hampshire | $1,003.75 | $5,197.00 |

## EXHIBIT A

| | | |
|---|---|---|
| New Jersey | $468.66 | $7,962.00 |
| New Mexico | $229.40 | $6,104.00 |
| New York | $1,010.00 | $12,293.00 |
| North Carolina | $606.63 | $2,293.40 |
| North Dakota | $464.46 | $25,686.00 |
| Ohio | $508.25 | $15,134.00 |
| Oklahoma | $188.60 | $15,058.05 |
| Oregon | $407.00 | $25,669.00 |
| Pennsylvania | $934.00 | $6,110.00 |
| Puerto Rico | $90.00 | $525.00 |
| Rhode Island | $376.00 | $5,187.00 |
| South Carolina | $829.00 | $2,798.00 |
| South Dakota | $99.80 | $25,685.00 |
| Tennessee | $270.00 | $13,426.00 |
| Texas | $1,549.00 | $12,130.00 |
| Utah | $238.70 | $85,255.00 |
| Vermont | $512.00 | $5,106.00 |
| Virgin Islands | $125.00 | $706.00 |
| Virginia | $353.50 | $3,969.50 |
| Washington | $430.00 | $9,648.00 |
| West Virginia | $268.67 | $4,276.67 |
| Wisconsin | $673.00 | $30,963.00 |
| Wyoming | $99.00 | $4,335.00 |
| Overseas | $439.69 | $13,713.88 |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## SACV11- 127 DOC (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐) <br> Kevin Ferguson, on behalf of himself and all others similarly situated | **DEFENDANTS** <br> Corinthian Colleges, Inc.; Corinthian Colleges, Inc., d/b/a Everest College; Corinthian Colleges, Inc., d/b/a Everest University; Corinthian Colleges, Inc., d/b/a Everest Institute; Corinthian Colleges, Inc., d/b/a Everest College of Business, Technology and Health Care; Heald College, LLC; Heald Capital, LLC |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br> JOHNSON BOTTINI, LLP <br> FRANCIS A. BOTTINI (175783), FRANK J. JOHNSON (174882) <br> 501 West Broadway, Suite 1720, San Diego, CA 92101 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:**   JURY DEMAND: ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

CLASS ACTION under F.R.C.P. 23: ☑ Yes  ☐ No   ☑ MONEY DEMANDED IN COMPLAINT: $ Proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Section 1332 Diversity Jurisdiction

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS <br> PERSONAL INJURY | TORTS <br> PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☑ 190 Other Contract | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 195 Contract Product Liability | **REAL PROPERTY** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | **REAL PROPERTY** | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 210 Land Condemnation | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 220 Foreclosure | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 240 Torts to Land | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: ~~SACV 11-00127-DOC(AJWx)~~
AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Florida |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See Attached | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  **January 24, 2011**

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

| Defendant | County in CA/Out of State Residence/ Foreign Country |
|---|---|
| Corinthian Colleges, Inc. | Orange County |
| Corinthian Colleges, Inc., d/b/a Everest College | Orange County |
| Corinthian Colleges, Inc., d/b/a Everest University | Orange County |
| Corinthian Colleges, Inc., d/b/a Everest Institute | Orange County |
| Corinthian Colleges, Inc., d/b/a Everest College of Business, Technology and Health Care | Ontario, Canada |
| Heald College, LLC | San Francisco County |
| Heald Capital, LLC | San Francisco County |